**UNITED STATES of America, Plaintiff,**

**v.**

**Omar WATSON, Defendant.**

**Crim. No. 91–00404–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 9, 1992.

Cory Justin Smith, U.S. Attys. Office, Alexandria, Va., for plaintiff.

Becky J. Moore, Land, Clark, Carroll & Mendelson, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

CACHERIS, Chief Judge.

Defendant, Omar Watson, was indicted in September of 1991 in the Eastern District of Virginia on one count of possession with intent to distribute crack cocaine, a violation of 21 U.S.C. § 841(a)(1), and one count of interstate travel in aid of racketeering, a violation of 18 U.S.C. § 1952(a). This matter is before the court on Defendant's Motion to Suppress the fruits of four searches conducted by officers from the Alexandria Police Department on the evening of September 24, 1991. The first search was of the Defendant, Omar Watson's, hotel room. The second search was of his person. The third search was of his luggage, and the fourth search was of his automobile. For the reasons set forth below, the Defendant's Motion to Suppress is granted as to the fruits of the searches of the Defendant's hotel room, the Defendant's person, and the Defendant's luggage. The Motion to Suppress is denied as to the fruits of the search of the Defendant's automobile.

## I

Under the pseudonym of Dean Jones, the Defendant checked into room 827 of the Embassy Suites Hotel in Alexandria, Virginia at 5:16 p.m. on September 20, 1991. At check-in, he indicated that the length of his stay was uncertain and that he would be paying day-by-day.[1] (Sawyer, Tr. at 7; Watson, Tr. at 112.) Subsequently, Mr. Watson would stop by the front desk, or somebody would stop by for him, and pay the room charge for the next day. Although official hotel policy is that guests must pre-pay their room charges for the next day by 12:00 p.m. the prior day, Mr. Watson paid for his room at a variety of different times throughout his stay. On September 21st he paid at 4:45 p.m. On September 22nd he paid at 3:12 p.m. On September 23rd, at Mr. Watson's request, a friend of his, Shawn Purvis, paid for the room at 10:09 p.m. (Purvis, Tr. at 107.)

On September 24th, the hotel's assistant general manager, Starr Sawyer, realized that the hotel was selling out. She checked the hotel records and noticed that the Defendant was "due out" that day. (Sawyer, Tr. at 9.) Around 3:45 p.m. or 4:00 p.m., Ms. Sawyer went up to the room to see if it was occupied or vacant and noticed a few items in the room. According to her testimony, she then left the room, returning at 10:00 p.m., (Sawyer, Tr. at 11), when she had only a few rooms left to sell. At that point, she determined that, because there were so few items in the room and because the hotel had not heard from the Defen-

[1]. The testimony on this matter must govern as Defendant's Exhibit 1 (consisting of a receipt for Mr. Watson's cash prepayment on September 20, an itemized bill covering the length of Mr. Watson's stay at the hotel, and another copy of Mr. Watson's bill detailing the phone numbers he called) shows three different departure dates, September 21st, September 25th, and September 24th respectively.

dant all day long, he was not coming back. (Sawyer, Tr. at 11.) Ms. Sawyer observed the following items of personal property in the room: a suitcase with side pockets sitting on the bed, (Sawyer, Tr. at 10–13; King, Tr. at 37; Watson, Tr. at 117), a maroon suit hung in the closet, approximately four neckties hung in the closet, a bottle of listerine, a deck of cards, and "little miscellaneous things . . . scattered throughout." (Sawyer, Tr. at 12, 29).

Pursuant to hotel policy, she began to inventory the items in the room so that she could, in her words, "secure them in lost-and-found until someone inquires for them." (Sawyer, Tr. at 23.) Upon opening one of the side-pockets of the suitcase she discovered "a large wad of bills." (Sawyer, Tr. at 13.) At that point, she ceased searching, re-keyed the room, and returned to the front desk to validate the address the Defendant had provided on his registration card. Defendant had given an address of 2500 Tara Street, Linwood, Illinois. (King, Tr. at 38.) Upon investigation, Ms. Sawyer found that there was no such address in the state of Illinois. (Sawyer, Tr. at 14–15; King, Tr. at 38–39.) She then questioned her staff regarding their knowledge of the Defendant. They told her that "someone other than the male who is registered to the room had paid for the room on each of these days," (Sawyer, Tr. at 15), and that the Defendant had many visitors and phone calls to the room at odd hours. (Sawyer, Tr. at 15–16.) At approximately 10:00 p.m., (King, Tr. at 55; Duquette, Tr. at 81–82), she called the Alexandria Police and described her suspicions to them. (Sawyer, Tr. at 16.)

Narcotics investigators George King, Harold Duquette, and Linda Erwin were dispatched to the hotel. Upon their arrival, they met Ms. Sawyer who again described the situation and then, at approximately 10:15 p.m., escorted them to room 827. (King, Tr. at 36–37.) She used her key to let them in, and gave them permission to look around. (King, Tr. at 38–39.) After she showed them the money in the suitcase, Officer Duquette radioed for a canine officer with a drug-sniffing dog to come and search the room for narcotics. (Du-

quette, Tr. at 75.) While the officers were waiting for the narcotics dog to arrive, they conducted what Officer King termed a "cursory" search of the room. (King, Tr. at 39.) As part of that search, the officers searched the maroon suit which Ms. Sawyer had taken out of the closet and placed on the bed. (Sawyer, Tr. at 19.) In one of the pants pockets, the officers found a folded brown piece of paper containing approximately one-half gram to a gram of powder cocaine. (King, Tr. at 40.)

At this point, Ms. Sawyer was notified by radio that the Defendant was at the front desk. (King, Tr. at 41.) Ms. Sawyer left and, about ten minutes later, the officers met the Defendant at the door to the room. Mr. Watson testified that he had returned to the hotel and went to the front desk to leave a deposit on his room while the bellman was unloading his car. The hotel records indicate that Mr. Watson paid for his room on September 24th at 10:33 p.m. (Defendant's Exhibit 1.) While Mr. Watson was paying, the hotel clerk informed him that there was a problem with the room and that the manager would have to open it. Mr. Watson finished paying and returned to his car to put it in the garage. The bellman insisted, however, that he would take care of the car and that Mr. Watson should leave it where it was. Mr. Watson and the bellman proceeded to the elevator and ascended to the eighth floor. When they got off the elevator, Mr. Watson looked across the open atrium and saw that the manager had not arrived at room 827. At the same time, the bellman received a call on the radio that required him to return to the lobby. Mr. Watson doesn't know whether the bellman took the cart with him or left it outside the elevator. Mr. Watson proceeded to walk around the triangle-shaped atrium the shortest distance between the elevator and the room. (Watson, Tr. at 119–124.) He gave the following account of what happened next:

> I proceeded down the hallway, made the turn, came all the way down this hallway, and when I got to the room, since no one was there to let me in, I kept going, just moseying, like moseying

around the hallway. I kept going to the end of the hallway and just looked at the coke machine, and by that time I turned around and just started to walk back. And I seen the door open and the—Detective Duquette stepped out of the room. As he turned around he looked down the hallway that I assume he was expecting me to come.

(Watson, Tr. at 125.)

Officer Duquette testified that, after waiting fifteen minutes for Mr. Watson to come up to the room, he stepped outside the room and walked over to the railing. Mr. Watson then approached Officer Duquette, catching him off guard, "because he was coming from the opposite direction where the entrance is." (Duquette, Tr. at 77.) According to Mr. Duquette, the following exchange occurred between him and Mr. Watson:

[H]e asked me if I worked for the hotel, and I said yes, I do. He said what are you doing in my room. I said I've been waiting for you. Then I pulled out my

badge, said I was a police officer, put your hands up against the wall.

(Duquette, Tr. at 77.)

Officer Duquette ushered Mr. Watson into the room where Officer King asked Mr. Watson whether the room was his and, upon receiving an affirmative answer, placed Mr. Watson under arrest.[2] Officer King then proceeded to search Mr. Watson. As part of the search, he reached into Mr. Watson's pants pocket and pulled out, among other things, a dollar bill, folded in thirds, from which a white powdery substance was seeping. (King, Tr. at 44.) A field test confirmed that the substance was cocaine. After the search of Mr. Watson's person, Officer King sat him in a chair in the room. The chair was located in front of a window that looked out onto the hallway. (King, Tr. at 45; Watson, Tr. at 129.) Mr. Watson was not handcuffed at this time.[3] As he was being seated in the chair, the bellman came to the room with the cart. The bellman left the cart outside the window and walked away.[4] At this point, the

2. There are three different versions of where Mr. Watson was arrested.

Officer Duquette testified that Mr. Watson was placed under arrest "as we brought him into the room." (Tr. at 78.)

Officer King, the arresting officer, testified that once Mr. Watson confirmed that room 827 was his room and that the articles inside belonged to him, he placed Mr. Watson under arrest while he was still in the hallway. (Tr. at 43–44.) He later testified, however, that the arrest was made "just inside the room." (Tr. at 71.)

Mr. Watson says that Officer Duquette asked him to step inside the room where Officer King asked Mr. Watson whether the room was his and, upon receiving an affirmative answer, placed Mr. Watson under arrest. (Tr. at 126–28.)

The United States Attorney's statements are not evidence, but it is interesting that his impression was that Mr. Watson was arrested in the room. He prefaced a question to Mr. King on redirect by stating: "Now, when the defendant was arrested, he was arrested inside the room." (Tr. at 70.)

The court believes that the Defendant's version is the more likely one.

3. Officer King stated that Mr. Watson was handcuffed before he was put in the chair, but Officer Duquette stated that "immediately after" the Defendant's arrest, he went downstairs to get some handcuffs from the canine officer. He did this because "[t]here was no one in the hotel

room when we got there originally and we didn't expect to arrest anybody." (Tr. at 78.) This statement indicates that it is more likely than not that, immediately after the Defendant's arrest, Officer King had no handcuffs with which to handcuff the Defendant.

Because of Officer Duquette's statement, and because the Defendant never mentioned being handcuffed, the court finds that the Defendant was not handcuffed while he was seated in the chair.

4. As with the question of where Mr. Watson was arrested, Officer King, Officer Duquette, and Mr. Watson each have conflicting versions of when the luggage cart was brought to room 827.

The Defendant says the bellman brought the cart up after the Defendant had been arrested and as he was being seated in a chair. (Watson, Tr. at 129.)

During his direct testimony, Officer King agreed. In response to the United States Attorney's query about what questions Officer King had asked Mr. Watson after he had arrested Mr. Watson, seated him in the chair, and advised him of his rights, Officer King replied as follows: "There was a bellman bringing luggage to the room and I asked Mr. Jones was that his luggage. He just looked at it and nodded his head back and forth." (King, Tr. at 45.) On cross-examination, however, Officer King's story changed. He stated that the valet was either trailing the Defendant or walked up behind him with the cart as the officers were talking to the

luggage cart was fifteen to eighteen feet away from the Defendant. (King, Tr. at 70–71.) One or more of the police officers later pushed the cart into the room. (Watson, Tr. at 129–30; Duquette, Tr. at 93.)

After Mr. Watson was placed under arrest, Officer Duquette went downstairs to meet the canine officer and to find handcuffs. Mr. Watson's car was sitting in the drive-through with the driver's side door open and the canine officer had it under observation. (Duquette, Tr. at 78, 97.) Officer Duquette asked the canine officer to do a search of the car. The drug-sniffing dog proceeded to climb into the car where he "started biting on the passenger seat, indicating that he hit on some type of narcotic smell, either on that seat or underneath it." (Duquette, Tr. at 79.) Officer Duquette then popped the trunk lever located next to the driver's seat. (Duquette, Tr. at 79, 97.) The dog jumped in the trunk and bit on a plastic foam food container. (Duquette, Tr. at 79, 97.) Officer Duquette opened the container and found roughly $16,000 in bundled cash. (Duquette, Tr. at 79.)

After the canine officer finished with the search of Mr. Watson's car, he proceeded up to room 827. Once there, he exposed

Defendant in the hallway. (King, Tr. at 61, 62, 64.)

On direct examination Officer Duquette stated that the luggage cart came up as the Defendant was being ushered into the room. (Duquette, Tr. at 78.) On cross, he stated that the luggage arrived while the Defendant's hands were up against the wall in the hallway. (Duquette, Tr. at 92.)

Given that the court believes Mr. Watson's explanation of why he approached the room from the "wrong" side (i.e., that he had come the shorter way from the elevator, passed the room, and then back-tracked because there was no one at the room to let him in), the court does not believe that the bellhop could have been "trailing" Mr. Watson. Due to the discrepancies in their accounts, the court also disbelieves the officers' story that the luggage arrived while Mr. Watson was still in the hallway. Accordingly, the court will assume that the luggage arrived after Mr. Watson's arrest, as he was being seated in the chair by the window.

5. Determining how the search of the luggage cart unfolded requires making a direct credibility call between the stories of Officer King and the Defendant, Mr. Watson.

the canine to the luggage cart. The luggage cart contained two clothes hampers, three large green trash bags, and two brown briefcases. (King, Tr. at 47.) The dog failed to alert to the luggage cart. The officers proceeded to search the items on the luggage cart until they found approximately 237 grams of cocaine and $12,-600 in cash. The cocaine was found inside two zip lock bags, which were inside a brown paper bag, which was inside one of the large green trash bags.[5] (Duquette, Tr. at 55.)

## II

### A. THE SEARCH OF THE HOTEL ROOM

#### 1. *Mr. Watson did not Abandon his Room*

■ The Government, citing *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960) (hotel had exclusive right to possession of hotel room where petitioner had abandoned the room by paying his bill and vacating the room), argues that Mr. Watson had no expectation of privacy in his room because he reasonably appeared to have abandoned it.

Officer King testified that the luggage cart was searched after the dog alerted to it. (King, Tr. at 48.)

The Defendant testified that from where the officers had placed him in the bathroom, he could see (by peeking out and by observing reflections in the microwave across the room) or hear much of what transpired regarding the luggage cart. According to Mr. Watson, he saw the dog smell each item on the cart and fail to make any reaction perceivable to him. Subsequently, the officers removed the items from the cart and searched them, finally locating the cocaine. He then heard the canine officer, who he believes had left the room and then returned, giving an excuse for why the dog hadn't alerted to the cart. One of the officers then suggested setting up a test with "four different things on the floor" and bringing the dog back. At this point there were at least five officers in the room. This time, stated Mr. Watson, "the dog made a reaction that I could even tell, like he smelled it." (Watson, Tr. at 134–40.)

Given Mr. Watson's demeanor on the stand and the prior inconsistencies of Officer King's version of events, the court believes Mr. Watson.

The court rejects this argument for two reasons. First, it was unreasonable for Ms. Sawyer to assume that the room had been abandoned when she observed that it contained a suitcase, a suit, four neckties, a bottle of listerine, a deck of cards and other miscellaneous items.[6] Second, Ms. Sawyer's assumption was also unreasonable given that Mr. Watson had never in his four-day stay at the hotel paid for his room by the 12:00 p.m. deadline. In fact, Shawn Purvis paid for Mr. Watson's room at 10:09 p.m. on September 23rd. This after-10:00 p.m. payment on September 23rd makes reasonable Mr. Watson's assumption that he could pay for his room at 10:33 p.m. on September 24th without surrendering his right to privacy in the room. *See United States v. Owens*, 782 F.2d 146, 150 (10th Cir.1986) (guest who had previously remained in his motel room past check-out time without consequence maintained reasonable expectation of privacy in that room). The presence in the room of many personal items in addition to the hotel's lax enforcement of its check-out policy and Mr. Watson's prior payment history suggest that Mr. Watson intended to continue his stay at the hotel and that it was reasonable for him to intend to continue his stay. The court finds that he did not abandon his room and that, at the time of the search, he had a reasonable expectation of privacy in the room and the personal things he had left in the room. Accordingly, a warrant was required to justify the search, absent the application of one of the established exceptions to the warrant requirement.

### 2. *Ms. Sawyer's Third–Party Consent was Invalid*

■ The Government argues that even if Mr. Watson retained a reasonable expectation of privacy in his hotel room, the warrantless search of the room was justified by Ms. Sawyer's third-party consent to the search.

*United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), is the leading case on the issue of third-party consent. In a footnote the Court explained:

> The authority which justifies the third-party consent does not rest upon the law of property, ..., but rests rather on mutual use of the property by persons generally having joint access or control for most purposes....

*Id.* 94 S.Ct. at 993 n. 7. A pre-*Matlock* case, *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), utilized *Matlock*'s shared authority approach. In that case, police investigating a robbery developed a lead that led them to a hotel. They were given access to the petitioner's hotel room by a clerk and searched it without a warrant while he was absent. The Supreme Court reversed his conviction writing:

> It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent.

*Id.* 84 S.Ct. at 893. *See also Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (holding that search by police officers of a house occupied by a tenant invaded the tenant's constitutional right, even though the search was authorized by the owner of the house, who had actual authority to enter the house for some purposes); *Owens*, 782 F.2d at 151 (manager lacked authority to consent to search of room on behalf of hotel guest who failed to strictly observe check-out time).

On the authority of *Stoner, Chapman*, and *Owens*, the court finds that Ms. Sawyer, the hotel's assistant general manager, did not have the requisite degree of joint access and control to vest her with the authority to consent to a search of the room on Mr. Watson's behalf. Consequently, the consent search exception to the warrant requirement does not apply and all fruits of the search of Mr. Watson's room must be suppressed.

6. Mr. Watson testified that the room also contained toiletries "sprawled across the bathroom sink" and various food items. (Watson, Tr. at 118.)

■ It should be noted that even if Ms. Sawyer's consent had been valid, the fruits of the search of the room would still have to be suppressed as the search exceeded the scope of a plain view search. Third-party consensual searches are limited to items in plain view. *United States v. Block,* 590 F.2d 535, 541 (4th Cir.1978). The plain view exception to the warrant requirement has its genesis in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). There the Court established that the plain view exception allows police to seize any items that are "immediately apparent" as evidence, meaning any items that, by the way they look, give police probable cause to believe they are evidence of criminal activity. *Id.* 91 S.Ct. at 2038; *see also* Charles H. Whitebread & Christopher Slobogin, *Criminal Procedure* § 11.04 (2d ed. 1986). Because there is nothing even remotely suspicious about a suit hanging in the closet or lying on the bed, much less suspicious enough to create probable cause, the search of the suit cannot be justified by the plain view exception to the warrant requirement.

## B. THE SEARCH OF THE DEFENDANT'S PERSON

■ The Government argues that the search of the Defendant did not violate his Fourth Amendment rights because it was a lawful search incident to arrest. The court disagrees. The most basic principle of search incident to arrest law is that a warrantless search is justified only if the arrest is lawful. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). When the arrest is invalid, the search is invalid.

In order for an arrest to be valid, the police must have probable cause to make the arrest. In *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the Supreme Court declared that police have probable cause for an arrest when they have reasonable, trustworthy information sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. *Id.* 85 S.Ct. at 225. Because the cocaine found in the Defendant's suit has been suppressed, the only information the police had at the time of the arrest was the information obtained from Ms. Sawyer. However, the cash she found in the suitcase and her and her staff's observations of Mr. Watson's behavior do not yield probable cause for an arrest. Because the arrest was invalid, the search is invalid as a search incident to arrest. Consequently, the cocaine retrieved from Mr. Watson's pants pocket by Officer King must also be suppressed.

## C. THE SEARCH OF THE LUGGAGE CART

The Government argues that the search of the luggage cart was lawful as a search incident to arrest. Again, because there was no probable cause to arrest Mr. Watson, the arrest and the subsequent search of the luggage cart were invalid. Consequently, all fruits of the search of the luggage cart are hereby suppressed.

■ It should be noted that, even if the arrest had been supported by probable cause, the evidence derived from the search would have to be suppressed. This is because searches incident to arrest are limited to the area within the immediate control of the arrestee—that is, the area from which he might gain possession of weapons or destructible evidence. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Because the luggage cart was out in the hallway (fifteen to eighteen feet from the Defendant) when the Defendant was arrested, it was out of his immediate control. Consequently, even if the arrest had been valid, the subsequent search exceeded the scope of a search incident to arrest.

## D. THE SEARCH OF THE DEFENDANT'S AUTOMOBILE

■ The Government argues that the search of Defendant's automobile was justified by probable cause achieved as a result of a canine sniff of the vehicle. The court agrees.

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983), the Court applied the principles of *Terry* to

canine sniffs of luggage and found that a canine sniff of luggage is justified if supported by reasonable suspicion and properly limited in scope. The *Place* holding has been extended to automobile searches. *See United States v. Stone,* 866 F.2d 359 (10th Cir.1989); *United States v. Quinn,* 815 F.2d 153 (1st Cir.1987).

 The first question, then, is whether the officers had reasonable suspicion for the canine sniff of the automobile. The court finds that they did. In *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the court found that a fairly modest amount of suspicion is enough for a *Terry*-like stop. The police must show "articulable facts" and "some minimal level of objective justification" for the stop, not just an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* 109 S.Ct. at 1585. However, each suspicious behavior may, when taken by itself, be completely consistent with non-criminal behavior as long as all the behavior, when taken together, suggests that criminal activity is afoot. *Id.* 109 S.Ct. at 1586.

The officers reasonably suspected Mr. Watson was involved with drug-dealing based on the information they learned from Ms. Sawyer. That information included the following: the Defendant was carrying a large amount of cash, he had very little luggage and was using a fake address, he received many phone calls and visitors at odd hours, and he did not always pay for his own room. Each of these items are consistent with non-criminal behavior. Given the low hurdle erected by *Sokolow* for reasonable suspicion, however, they are enough when taken together to have created a reasonable suspicion of drug dealing in the officers' minds.

 It is clear then that the officers could use the dog to sniff the exterior of Mr. Watson's car. The next question, however, is whether by jumping in the open passenger door, the dog caused what is

supposed to be a very limited encounter to escalate into a violation of the Fourth Amendment. Relying on *United States v. Stone,* 866 F.2d 359 (10th Cir.1989), the court finds that the dog's actions were within the bounds of a proper canine sniff. In *Stone,* the dog jumped through a car's open hatchback and proceeded to do a canine sniff of the car. The court held that the dog's "instinctive actions" did not violate the Fourth Amendment because the police did not ask the Defendant to open the hatchback so the dog could jump in, nor did the police handler encourage the dog to jump in. *Id.* at 364. As in *Stone,* this court was presented with no evidence that the dog was encouraged to jump in the car by its handler. Consequently, the court follows *Stone* and declares that the canine sniff of the passenger compartment was proper.

 Once the dog alerted to the passenger seat, the officers had probable cause to believe the automobile contained narcotics. Thereafter, the search of the trunk and of the foam container in which the $16,000 in cash was found was justified by the automobile exception to the warrant requirement. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982) (holding that "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search"). For these reasons, the search of Mr. Watson's car and the foam container in the trunk was not unreasonable within the meaning of the Fourth Amendment and the money seized from the foam container is, therefore, admissible.[7]

---

7. Unlike the dog sniff of the automobile, the dog sniff of the luggage cart was unreasonable under the Fourth Amendment for the following three reasons:

1. The dog sniff of the cart occurred in the Defendant's hotel room, where the officers had no legal right to be;
2. The dog alerted to drugs on the cart only after the officers had intruded on Mr. Watson's

privacy (i.e., searching through his things and then spreading them on the floor) to a degree far greater than envisioned in *Place;* and

3. Even if the dog had alerted to the luggage while it remained on the cart, that would simply have given the officers probable cause to obtain a warrant to search the luggage on the cart. There is no "luggage cart exception" akin to the automobile exception to the warrant requirement.