895 A.2d 1076

Oscar E. CRUZ

v.

STATE of Maryland.

No. 1417 Sept. Term, 2005.

Court of Special Appeals of Maryland.

April 4, 2006.

Edward A. Richitelli, Elkton, for Appellant.

Gary E. O'Connor (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, DEBORAH S. EYLER and KENNEY, JJ.

HOLLANDER, Judge.

In this appeal, we must determine whether a canine scan of a motor vehicle constituted an illegal search under the Fourth

Amendment when, during the scan, the dog poked his head through an open window of the vehicle and then immediately alerted. After the dog alerted, the police searched the vehicle and recovered almost twelve pounds of cocaine. Claiming the canine scan was unlawful, Oscar E. Cruz, appellant, moved to suppress the drugs. The Circuit Court for Cecil County (Jackson, J.) denied his motion. Cruz subsequently tendered a plea of not guilty pursuant to an agreed statement of facts, and was convicted of importing a controlled dangerous substance into Maryland. The court (Lidums, J.) sentenced appellant to four years' imprisonment.

On appeal, Cruz presents one question, which we quote:

Did the [motion] court err in denying appellant's motion to suppress the evidence and statements seized, which motion was based upon appellant's claim that the evidence was the product of an unconstitutional search, where the dog *scanning* the appellant's vehicle did *not* have a right to invade any part of the *interior* of appellant's vehicle *prior* to alerting his police-officer master to the presence of contraband?

For the reasons that follow, we shall affirm.

## FACTUAL AND PROCEDURAL SUMMARY[1]

On the afternoon of February 15, 2005, Maryland State Police Sergeant Mike Lewis "observed a silver-colored 2005 Chevy Trailblazer traveling southbound on Interstate 95 directly behind a pickup truck in front of it." Lewis testified that his "initial thought was that it was likely being towed because it was so close" to the vehicle in front of it. He also "noticed a Chevy Monte Carlo directly behind the Trailblazer also following it entirely too closely." Although Lewis "attempt[ed] to stop both vehicles," he was only able to effect a stop of the Trailblazer, which occurred at about 12:47 p.m.

---

1. Our factual summary derives solely from the suppression hearing conducted in July of 2005.

Appellant, the sole occupant of the vehicle, "was identified by a Massachusetts driver's license."

The traffic stop was recorded by a video camera located in Officer Lewis's vehicle. The videotape was admitted into evidence, without objection, and was played in open court.[2]

Describing his initial encounter with appellant, Lewis stated:

As he surrendered his driver's license to me, I noticed his hands were trembling very badly. I noticed he avoided all eye contact with me. I also asked for a registration card. He informed me that the vehicle was a rental. As he looked for a rental agreement for the vehicle, I noticed his chest was palpitating. I noticed the carotid pulse was pounding on the right side of his neck and I was standing at the passenger side open window of the SUV.

Upon review of the registration documents produced by appellant, Lewis noticed "that the vehicle had been rented at 6 a.m. that morning from Logan International Airport" and that it "had to be back to Logan ... the following morning." But, Lewis saw no luggage when he "peered" through the glass. He testified:

Observing no luggage in the vehicle coupled with the indicators I saw present in Mr. Cruz, that being the trembling hands, the evasive eye contact, the chest palpitating, the carotid pulse pounding in his neck, as I walked back to my car I peered through the side tinted glass in the vehicle. From the outside I saw one cardboard box on the rear cargo floor indicating a Dremel rotary power tool would be inside. I noticed the box to be taped at one end.

Based on his observations, Sergeant Lewis returned to his vehicle and requested "a certified drug detection K-9 han-

---

2. In his testimony, Sergeant Lewis stated that he stopped appellant "at approximately 12:59 p.m." However, the videotape of the stop contains a time stamp in the lower right hand area of the screen, and it indicates that Sergeant Lewis stopped the Trailblazer at 12:47 p.m. As appellant does not challenge the validity of the traffic stop, the discrepancy is not material.

dler." He also requested "a driver's license check and wanted check" on appellant. Trooper Joseph Catalano, a drug dog handler, promptly responded to the scene, along with Bruno, a yellow Labrador Retriever "certified in the detection of controlled dangerous substances." [3] Lewis directed Trooper Catalano and Bruno to conduct "a K–9 scan of the vehicle." Trooper First Class Mike Conner, who had also arrived at the scene, "had Mr. Cruz step away from the vehicle so the K–9 scan could be safely conducted."

Sergeant Lewis testified that he "observed Trooper Catalano scan the vehicle" and also "observed the dog sit down, which indicates a passive alert for the presence of narcotics being inside the vehicle." Sergeant Lewis then saw "Trooper Catalano open the right rear door of the Chevy Trailblazer and put Bruno inside the vehicle." According to Lewis, "Trooper Catalano would only do this if the dog had alerted for the presence of narcotics outside of the vehicle."

Sergeant Lewis described what happened next:

> I stepped from my car. I then approached the SUV. I opened the rear tailgate to remove the cardboard box, the only item I saw in the entire vehicle, and as I went to open the rear tailgate, the cardboard box actually fell out of the vehicle onto my feet on the roadside and hit my toes. I picked the box up. I quickly removed the tape from the one end. Inside the box was 5,370 grams of cocaine or 5.3 kilograms of cocaine inside the box.

Sergeant Lewis added that the U.S. customary weight of the cocaine was equal to 11.9 pounds. Appellant "was arrested on the spot," and was advised of his *Miranda* rights.[4]

During Trooper Catalano's testimony, the videotape was played for the court a second time, as Catalano explained "to

---

**3.** Catalano and Bruno had previously been qualified as experts in canine detection of controlled dangerous substances. Their qualifications are not in issue.

**4.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**154**

the court what [was] being depicted on the videotape." Notably, the videotape does not show whether Bruno put his head through the window of appellant's car. The following testimony is pertinent:

[THE COURT]: Did you just say that as you came up to the vehicle you gave the command to seek?

[TROOPER CATALANO]: As I come up I was giving [Bruno] the command to seek. *As you can see he immediately goes to this one corner here and he stops, and that I would consider a behavior change because he stopped his forward motion.* He already knows what he needs to know when we walked up to the car. What he does, he stops and corners in on the one corner of the tailgate or the hatch where it meets the bumper.

I believe here, [Y]our Honor, this—you can see his tail wagging. That indicates—he's still on all four legs in an upright position, and *he on his own jumps up into the window, open window, jumps up; puts his paws up on like the window sill.* Now, your Honor, you see his tail is now sweeping the ground area, which indicates to me that he—I know he did sit, but because according to this he's not able to see—*you can see his tail sweeping the ground which indicates that he's sitting.*

[THE COURT]: What was the significance of the sit?

[TROOPER CATALANO]: A sit—they are trained to give a final response of alerting to—on a particular odor of drugs that he is trained on, and *a sit is his final response. That tells me that he has alerted to that vehicle.*

[PROSECUTOR]: So as of—according to the videotape, Trooper Catalano, that would be at 1256 approximately, is that correct?

[TROOPER CATALANO]: That's correct.

(Emphasis added).

Thereafter, Catalano "put [Bruno] inside the vehicle to scan the general area." The videotape shows that Bruno entered through the right rear door of the vehicle at 12:56:43. At 12:56:53, another officer approached the vehicle and opened

the rear hatch. The box with the cocaine fell out of the hatch at 12:56:55, and Catalano removed Bruno from the vehicle at 12:56:56.

The following exchange is relevant:

[PROSECUTOR]: Now let me ask you something while we still have the tape in front of us. *Trooper Catalano, would you ever put Bruno into a vehicle without him having alerted to the outside of the vehicle?*

[TROOPER CATALANO]: *No, I would not.* He would have to alert to the outside before I would ever put him on the inside of a vehicle.

[PROSECUTOR]: Is it your testimony that on this particular stop he had alerted prior to your going to the door and opening it and letting him into the car?

[TROOPER CATALANO]: That's correct. *I first observed the behavior change in the rear corner by his forward moving stop.* I then—that's why I do pull him around, get him—give him a second chance at it, which *he then* comes around, then shoots down to the side, goes into the— *automatically goes to the open window.* As a trained handler I observe. He is directed to go to the source. Stronger odor—*he's catching a stronger odor in the open window* than he is in the rear axle door.

[PROSECUTOR]: Then thereafter he sat—actually made—

[TROOPER CATALANO]: After jumping up to the window he then went into the—actually does a swipe, another indicator of behavior changes. Took his paw and goes to the source. That's his dominant possession of that vehicle, pawing it.

(Emphasis added).

On cross-examination, the following ensued:

[APPELLANT'S COUNSEL]: So after jumping up through the window he gives you the indication that you believe is an alert?

[TROOPER CATALANO]: I know he did alert by sitting. That's his final response. *You have behavior—several be-*

*havior changes, and then he still might want to search, trying to get to the—directly to that odor,* closest to the odor; then final response, him saying yes that is a hot car, he sits down.

[APPELLANT'S COUNSEL]: My thinking at your earlier testimony—correct me if I am wrong—he did that after jumping to the—through the window?

[TROOPER CATALANO]: Which is—always indicates a behavior change. *There is something in that window he wanted to get to.* Swerves around, then he falls—goes into a sit. *Excuse me. Let me correct it. He didn't jump through the window. He just jumped up to get a better sniff.*

[APPELLANT'S COUNSEL]: *He stuck his head in the window?*

[TROOPER CATALANO]: *Yes.*

[APPELLANT'S COUNSEL]: **His paws were up on where, the open window?**

[TROOPER CATALANO]: **Yes, I believe so.**

(Emphasis added).

Cruz testified that he stepped out of the car when asked, that the door was closed behind him after he got out, and that no one sought his consent to search the vehicle. Appellant also said: "The policeman took the dog to the passenger side front. The dog turned around and came out." However, Cruz did not testify that he saw Bruno put his head through the window of his car.

Appellant's counsel conceded that there was no dispute "that the dog sat down to alert." Nevertheless, urging the court to suppress the cocaine, appellant's counsel stated:

Your Honor, I believe that videotape and Officer Catalano's testimony indicates that this dog crossed the line of what was permissible, was more than a scan of the outside of the vehicle. The dog, his determination—it is in the record—jumped through the thing. He qualified that. Excuse me. He qualified that to indicate that he didn't

actually—the dog didn't actually go in through there but actually the dog—*his head was inside and paws were up on the open window. So I believe that's crossing the point of where the dog is invading the space of the defendant, and the defendant has a reasonable right to privacy.* At this point he's exceeded it. *It wasn't simply an outside scan in which the dog alerted.* The record is clear on what that is.

Respectfully, I think—I believe that the evidence and the law require that the evidence be suppressed in light of having crossed that boundary, and I respectfully ask the evidence in the form of drugs seized be suppressed from evidence in this case, and any statements that subsequently came as a result of having been arrested from what I believe to be—was an unconstitutional search be suppressed.

(Emphasis added).

In response, the prosecutor argued that "there was probable cause for the stop. The alert was done by the dog in response to a situation that the dog was well-trained for."

Denying the motion to suppress, the court reasoned:

Well starting at the beginning, I find that the probable cause for the stop—I wrote down the times, although maybe I don't need to spend much time on that. Nobody is arguing the time. The defendant was stopped at 1247, the radio call for the dog handler went out at 1251; at 1251 the call was into the barracks for—there was incidentally another traffic stop taking place at the same time. At 1254 there was still no response back from the barracks. 1254—56, that is, 56 seconds past—1254 Trooper Catalano and Bruno were there. At 1255.29—well actually before Trooper Catalano got there—at 1255.29 the defendant was out of the car. It is on 1256.18 the dog is to the car. On videotape he's out of sight momentarily, and at 1256.50 the door has been opened, the dog having alerted.

The time lapse is perfectly reasonable. It is without artificially prolonging the traffic stop. The dog went around the outside of the vehicle. *He started acting like he*

*was smelling something at the rear corner of the door—* excuse me. ***The window apparently was down. The police didn't put the window down. The window was down.*** *If a police officer is walking around a vehicle and a window is down I don't think it is unconstitutional for the police officer to smell whatever is coming through the window. That's exactly what the dog did. He didn't invade any private protected area. He's making an outside scan of the car, smelled something coming out the window. He got up on hind feet, put front feet on the end of the window momentarily, then he alerted.*

Looks like a classic K–9 scan to me. I think it provided probable cause.

(Emphasis added.)

## DISCUSSION

██ Appellant contends that, because the drug dog's head poked through the open window of appellant's vehicle *before* alerting to the presence of drugs, the canine scan was "constitutionally *im*permissible" under the Fourth Amendment. Cruz asserts: "While previous case law makes it clear that it was lawful for the dog to be present on the scene to do a sniff of the *exterior* of the appellant's vehicle, the dog was not lawfully present when its head invaded the inside [of] the appellant's vehicle."

The State offers several alternative bases to uphold the circuit court. First, the State argues that Bruno's "sniff" was "a permissible non-search under Supreme Court and Maryland precedent" because "the suppression court found that the dog's nose did not enter the interior of the vehicle." It asserts:

The testimony at the suppression hearing did not clearly address whether the dog's head actually entered the vehicle.

\* \* \*

It is noteworthy that at the suppression hearing Cruz's counsel did not ask, and Trooper Catalano did not explicitly

say, whether the dog's head was actually "inside" the vehicle or whether his head went "through" the window.

Second, the State argues that, "[e]ven if the dog's nose briefly entered the interior of the vehicle," it did so "without prompting from the officer," and so the entry "should be treated as the functional equivalent of an exterior canine scan of the vehicle—i.e., as a non-search." Third, the State contends: "Even if the canine scan constituted a search, there was probable cause for the search because of the dog's behavior changes before his nose might have entered the open window—stopping at the rear corner of the vehicle and jumping up on the vehicle."

In reviewing a trial court's ruling with respect to a suppression motion, we look solely to the record of the suppression hearing. *Myers v. State,* 165 Md.App. 502, 518, 885 A.2d 920 (2005); *see Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003); *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000). Moreover, we review the evidence in the light most favorable to the prevailing party. *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612 (2001); *Myers,* 165 Md.App. at 518, 885 A.2d 920; *Charity v. State,* 132 Md.App. 598, 605–06, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000). In this endeavor, "[w]e accept the suppression court's first-level factual findings unless clearly erroneous, and give due regard to the court's opportunity to assess the credibility of witnesses." *Faulkner v. State,* 156 Md.App. 615, 640, 847 A.2d 1216, *cert. denied,* 382 Md. 685, 856 A.2d 721 (2004); *State v. Fernon,* 133 Md.App. 41, 44, 754 A.2d 463 (2000). However, "[w]hen the question is whether a constitutional right . . . has been violated, the reviewing court makes its own independent constitutional appraisal, by reviewing the law and applying it to the peculiar facts of the particular case." *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996); *see also Dashiell,* 374 Md. at 93–94, 821 A.2d 372; *Stokes,* 362 Md. at 414, 765 A.2d 612; *Myers,* 165 Md.App. at 518, 885 A.2d 920.

Here, according to Officer Catalano, Bruno's behavior changed at the corner of the vehicle. Then, of Bruno's own accord, and without any command from Catalano, the dog jumped up on the car "to get a better sniff," and "stuck his head in the window." The motion court found that Bruno's behavior changed at the rear corner of the vehicle, before he jumped up, but the court did not find that the dog's conduct at the corner of the vehicle amounted to an alert. Instead, the court found that Bruno alerted only after he "smelled something coming out the window." Although the motion court did not expressly resolve whether Bruno's nose or head actually entered the interior of the vehicle before he alerted, the court was satisfied that Bruno "didn't invade any private protected area."

Therefore, in analyzing this case, we shall assume that Bruno jumped upon the vehicle before he alerted, put his head through the open window, and then alerted. In turn, we must decide whether the dog's conduct exceeded the scope of a lawful canine scan. We hold that the canine scan was lawful, and explain.

The Supreme Court has addressed the issue of canine scans in *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); and *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). We pause to review these cases.

In *Place*, 462 U.S. at 707, 103 S.Ct. 2637, the Court concluded that the canine sniff of luggage at an airport was not a search because it "discloses only the presence or absence of narcotics, a contraband item," without requiring the opening of the suitcase. The Court characterized the canine sniff as "limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* Further, it pointed out that, "despite the fact that the sniff tells the authorities something about the contents of the luggage, the ... limited disclosure ... ensures

that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *Id.*

In *Jacobsen,* the Court concluded, 466 U.S. at 122–24, 104 S.Ct. 1652, that a field test of white powder seized by government agents was not a search. Relying on *Place,* the Court analogized the field test to a dog sniff, which reveals only the presence or absence of contraband. In its view, the field test likewise did not infringe upon a legitimate expectation of privacy. *Id.* at 122, 104 S.Ct. 1652.

In *City of Indianapolis,* 531 U.S. at 40, 121 S.Ct. 447, the Court found unconstitutional a highway checkpoint program designed to discover and interdict illegal narcotics, but noted that the program's use of dogs to sniff the outside of automobiles was constitutional. Relying on *Place,* the Court stated:

Just as in *Place,* an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. Like the dog sniff in *Place,* a sniff by a dog that simply walks around a car is "much less intrusive than a typical search."

*Id.* at 40, 121 S.Ct. 447 (citations omitted).

More recently, in *Caballes,* 543 U.S. at 409, 125 S.Ct. 834, the Supreme Court determined that a drug dog's sniff of the exterior of an automobile that had been lawfully stopped for speeding did not "implicate legitimate privacy interests." Because the sniff revealed only the "location of a substance that no individual has a right to possess," the Court concluded that the scan did not violate the Fourth Amendment. *Id.* at 410, 125 S.Ct. 834.

Numerous Maryland cases have recognized that a positive alert by a drug dog during an exterior scan of a vehicle gives rise to probable cause to search that vehicle. In *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), for example, the Court said: "We have noted that once a drug dog has alerted a trooper 'to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a

vehicle].'" *Id.* at 586, 774 A.2d 420 (quoting *Gadson v. State,* 341 Md. 1, 8, 668 A.2d 22 (1995), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996)). *See also State v. Wallace,* 372 Md. 137, 145, 159, 812 A.2d 291 (2002) (noting that "canine sniff" of the vehicle "provided the police officers with probable cause to search the car," but concluding that a canine alert on the exterior of a vehicle does not provide probable cause to search a particular occupant of that vehicle), *cert. denied,* 540 U.S. 1140, 124 S.Ct. 1036, 157 L.Ed.2d 951 (2004); *State v. Cabral,* 159 Md.App. 354, 859 A.2d 285 (2004) (a positive alert by a drug dog gives probable cause to search, even if the alert pertains to a residual odor); *Carter v. State,* 143 Md.App. 670, 674, 795 A.2d 790 ("The dog 'alert' supplied the probable cause for a warrantless search of the van."), *cert. denied,* 369 Md. 571, 801 A.2d 1032 (2002); *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001)("When a qualified dog signals to its handler that narcotics are in a vehicle ... that is *ipso facto* probable cause to justify a warrantless *Carroll* Doctrine search of the vehicle."); *In re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991) (stating that "[t]he dog's reaction properly served as probable cause to search the vehicle"), *aff'd.,* 325 Md. 527, 601 A.2d 1102 (1992); *Snow v. State,* 84 Md.App. 243, 248, 578 A.2d 816 (1990) (stating that canine alert at perimeter of car "could be held to provide probable cause to search the interior of the car.").

The recent case of *Fitzgerald v. State,* 384 Md. 484, 864 A.2d 1006 (2004), is instructive. There, the Court of Appeals determined that a dog sniff conducted in the common area of an apartment hallway, and at the exterior of an apartment door, did not amount to a "search" under the Fourth Amendment. *Id.* at 494–95, 864 A.2d 1006. Based on its review of Supreme Court decisions, the Court observed: "The only relevant locational determination is whether the dog was permitted outside the object sniffed." *Id.* at 494, 864 A.2d 1006. The *Fitzgerald* Court added that "the location or circumstance of the sniff was relevant only to determine whether the dog and officer's presence there was constitutional." *Id.* The Court explained, *id.* at 493–94, 864 A.2d 1006:

*Place* and *Jacobsen* together establish that government tests, such as *a canine sniff,* that can reveal only the presence or absence of narcotics and are *conducted from a location where the government officials are authorized to be, i.e. a public place, are not searches.*

A review of *Place* and *Jacobsen* indicates that a crucial component of the Supreme Court's holdings is the focus on the scope and nature of the sniff or test, rather than on the object sniffed, in determining whether a legitimate privacy interest exists.

(Emphasis added.)

While recognizing that "the dog and police must lawfully be present at the site of the sniff," the Court concluded that "binding and persuasive authority compel our holding that a dog sniff of the exterior of the residence is not a search under the Fourth Amendment." *Id.* at 503, 864 A.2d 1006. Notably, in reaching its decision, the Court pointed out that the canine and his police handler "lawfully were present, as the apartment building's common area and hallways were *accessible to the public through an entrance of unlocked glass doors." Id.* at 504, 864 A.2d 1006 (emphasis added; citations omitted).

Nevertheless, appellant seizes on *dicta* in *Fitzgerald* to support his contention that Bruno's scan was illegal. He notes that in *Fitzgerald* the Court underscored that the dog "occupied the same position as the government agent; he observed from the public space outside the residence." *Id.* at 498, 864 A.2d 1006. But, as Cruz points out, the Court went on to say that, *"[w]ere [the dog] to have entered the residence himself without a warrant, he would have conducted an unconstitutional search."* (Emphasis added).

We are not persuaded by appellant's reliance on *dicta* in *Fitzgerald.* The cases cited above lead us to conclude that, under the circumstances attendant here, Bruno's brief and instinctive intrusion into the open window of the vehicle did not transform the scan into an illegal interior search. As in *Fitzgerald,* Bruno and Trooper Catalano "lawfully were present at the site of the sniff," 384 Md. at 503, 864 A.2d 1006; the

officer and the dog had a right to stand outside the vehicle, which had been lawfully stopped for a traffic offense. And, of significance here, it is undisputed that the window of the vehicle was already open when Bruno jumped onto the sill, and Catalano never instructed Bruno to jump. Rather, as Catalano testified, Bruno "on his own . . . put his paws up on . . . the window sill." Moreover, the videotape demonstrates that Bruno briefly "stood" on his back legs, with his paws upon the door, and then immediately went into a full-alert "sit."

In essence, while in a public place, Bruno responded to the smell he detected, which was emanating from the open car window. Accordingly, the motion court was not clearly erroneous in finding that Bruno simply "smelled something coming out of the window" after his scan of the car's exterior, "got up on [his] hind feet, put front feet on the end of the window momentarily," and then alerted.

Courts in other jurisdictions have considered whether the Fourth Amendment is violated by a dog's entry into the interior of a vehicle during a canine scan. In general, these cases support our conclusion.

In *United States v. Stone*, 866 F.2d 359 (10th Cir.1989), the dog was commanded to sniff the car and "became interested underneath the car at the passenger side where the door was open." *Id.* at 362. The defendant challenged the legality of the canine search because the dog jumped into the open hatchback and "keyed" on illegal "substances he was trained to detect. . . ." The dog "apparently did not positively 'key' on the methaqualone until he was inside the car." *Id.* at 363. So, "when the dog jumped into the hatchback of Stone's car the police had only reasonable suspicion to believe it contained narcotics. Only after the dog was in the trunk, where it 'keyed' on the methaqualone, did the police have probable cause." *Id.* at 364.

The Tenth Circuit acknowledged that, "[e]ven though the police could use a trained dog to sniff the exterior of Stone's automobile, the dog created a troubling issue under the

Fourth Amendment when it entered the hatchback." *Id.* at 363. Nevertheless, the Court upheld the denial of the suppression motion, agreeing with the trial judge "that the dog's instinctive actions did not violate the Fourth Amendment." *Id.* In this regard, the appellate court pointed out that "[t]here is no evidence, nor does [defendant] contend, that the police asked [defendant] to open the hatchback so the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car." *Id.* Accordingly, the court concluded that "the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe the automobile contains narcotics." *Id.*

*United States v. Watson,* 783 F.Supp. 258 (E.D.Va.1992), is also illuminating. In that case, the federal court addressed the question of "whether by jumping in the open passenger door, the dog caused what is supposed to be a very limited encounter to escalate into a violation of the Fourth Amendment." *Id.* at 265. Relying on *Stone,* the court stated, *id.*:

> [T]he court finds that the dog's actions were within the bounds of a proper canine sniff. In *Stone,* the dog jumped through a car's open hatchback and proceeded to do a canine sniff of the car. The court held that the dog's "instinctive actions" did not violate the Fourth Amendment because the police did not ask the Defendant to open the hatchback so the dog could jump in, nor did the police handler encourage the dog to jump in. *Id.* at 364. As in *Stone,* this court was presented with no evidence that the dog was encouraged to jump in the car by its handler. Consequently, the court follows *Stone* and declares that the canine sniff of the passenger compartment was proper.

*State v. Logan,* 914 S.W.2d 806 (Mo.App.1995), is also relevant. There, a trained drug dog, while scanning a vehicle, "suddenly jumped into the car through an open rear window" and then " 'alerted' on the trunk of the car as trained to indicate the presence of drugs." *Id.* at 807. The appellant complained that, "unlike the search under scrutiny in *Place,* the search ... did not take place in a public area." *Id.* at 810.

The court acknowledged that the dog "entered the interior" of appellant's car, the window of which "had apparently been left open by the defendant and his wife." *Id.* But, it noted that there was "no evidence" that the dog had been "prompted by his handlers to enter the car." Relying on *Stone*, the court found that the entrance of the dog into the car was not "equivalent for fourth amendment purposes to an entrance into the car by a police officer." *Id.* at 810. Therefore, it concluded that "the trial court did not err in admitting the evidence obtained as a result of [the dog's] investigative sniffing." *Id.*

In *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir.1990), the Tenth Circuit reversed a district court's grant of a motion to suppress. In that case, the appellate court considered "whether the police must have a reasonable suspicion of drug-related activity before employing a narcotics-detection dog to sniff a vehicle already detained by the police." *Id.* at 203. The court held "that the dog sniff, under these circumstances, is not a 'search' within the meaning of the fourth amendment and therefore an individualized suspicion of drug-related criminal activity is not required when the dog sniff is employed during a lawful seizure of the vehicle." *Id.*

Of import here, the Tenth Circuit rejected the argument that the defendants had "a legitimate expectation of privacy in the odor of narcotics detected by the dog because this odor emanated from inside their vehicles, a private area protected by the fourth amendment." *Id.* at 205. The court stated that, "when the odor of narcotics escapes from the interior of a vehicle, society does not recognize a reasonable privacy interest in the public airspace containing the incriminating odor." *Id.*

*United States v. Perez*, 37 F.3d 510 (9th Cir.1994), is also pertinent. There, the Ninth Circuit considered "[w]hether a search went beyond the scope of a suspect's consent" when the dog, while outside of the vehicle, "alerted to the spot on its undercarriage where the drugs were found." *Id.* at 515–16. The defendant claimed that " '[n]o reasonable person . . . could

have foreseen that his consent [to search] opened the door to a trained K–9 unit's examination of their entire automobile.'" *Id.* at 515. Rejecting that claim, the court determined "that the search was not more intrusive than Perez had envisioned when giving his consent, but rather simply more effective." *Id.* at 515–16. According to the appeals court, "The undercarriage of a van, where the drugs were found, is not a uniquely private space." *Id.* at 516 (citations omitted). Further, it stated: "Using a narcotics dog to carry out a consensual search of an automobile is perhaps the least intrusive means of searching because it involves no unnecessary opening or forcing of closed containers or sealed areas of the car unless the dog alerts." *Id.* (citations omitted).

The State also refers us to *Commonwealth v. Rogers,* 741 A.2d 813, 820 (Pa.Super.Ct.1999) *aff'd,* 578 Pa. 127, 849 A.2d 1185 (2004), in which the Superior Court of Pennsylvania, relying on *Stone,* noted that "the window was open, the dog was not prompted to enter the vehicle and once he did the search was immediately terminated." The court stated that it did "not believe such a limited intrusion into the vehicle under these particular facts was violative" of either Pennsylvania law or the Fourth Amendment to the U.S. Constitution.

We recognize that other courts have held that a dog's entry into the interior of a vehicle during a canine scan constituted an unreasonable search. But, those courts have based their decisions on evidence that the handler facilitated or encouraged the dog's entries into the vehicles. *See State v. Warsaw,* 125 N.M. 8, 956 P.2d 139, 143 (Ct.App.1997) (distinguishing *Stone* and *Watson,* noting that "Officer Williams reached into the trunk to remove the glass-laden carpet because he expected the dog to jump in there. [The dog], under the preparation, guidance, and stimulation of Officer Williams, jumped into the open trunk"); *United States v. Winningham,* 140 F.3d 1328, 1331 (10th Cir.1998) ("A desire to *facilitate* a dog sniff of the van's interior, absent in *Stone,* seems readily apparent here"); *State v. Freel,* 29 Kan.App.2d 852, 32 P.3d 1219, 1225 (2001) (finding that the officer "encouraged the dog to enter into the car when it had not alerted on the exterior").

In this case, there was absolutely no evidence to suggest that the police encouraged Bruno to jump up on the car and stick his nose through the window of Cruz's vehicle. To the contrary, the record reflects that the dog acted instinctively, because he detected from the open window the odor he was trained to identify. Indeed, Catalano testified that the dog "on his own jump[ed] into the window...." Moreover, Mr. Cruz had no "reasonable privacy interest" in the odor of cocaine emanating from the car, which Bruno detected from "the public airspace." *Morales–Zamora*, 914 F.2d at 205. For these reasons, we shall affirm.[5]

**JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**5.** Because we conclude that Bruno's entry into the open window was not a search, we need not address the State's alternative contention that, if the dog's conduct amounted to a search, it was supported by probable cause, based on the dog's earlier change in behavior at the corner of the vehicle. *See United States v. Seals*, 987 F.2d 1102, 1106–08 (5th Cir.) (the dog "was led around the car, but did not alert on the exterior of the vehicle"; instead, the dog "jumped up on the driver's side window," which the dog's handler interpreted as an alert; once the dog alerted to the presence of drugs, the officers had probable cause to search), *cert. denied*, 510 U.S. 853, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993).