988 A.2d 1154

**Leshone JACKSON**

**v.**

**STATE of Maryland.**

**No. 2887, Sept.Term, 2008.**

Court of Special Appeals of Maryland.

Feb. 4, 2010.

498

Michael C. Dawson of New Brunswick, NJ, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief), for appellee.

Panel: WOODWARD, MATRICCIANI, MOYLAN, and CHARLES E., JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

The relationship between a traffic stop and a *Terry*-stop for drugs is a fascinating one, particularly because of its frequently shifting nature. When the relationship is sequential and the traffic stop winds down before the *Terry* stop has attained viability, it will be a choppy crossing for the prosecution if critical evidence has only been recovered in the course of the late-starting *Terry* stop. *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999); *Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115 (1997). If, on the other hand, the *Terry* stop bursts into bloom before the traffic stop has faded, so that their life cycles overlap even briefly, fortune's wheel will have turned against the defense. *State v. Ofori,* 170 Md.App. 211, 906 A.2d 1089 (2006). Sequence and timing are everything.

## Procedural History

The appellant, LeShone Jackson, was convicted by Judge Dexter M. Thompson, Jr., on an agreed statement of facts, in the Circuit Court for Cecil County, of the possession of heroin with the intent to distribute. The appellant had reserved his right to appeal from the denial of his pretrial motion to suppress the physical evidence by Judge Raymond E. Beck. Although the appellant unnecessarily fragments his arguments, what is before us is the single question of whether Judge Beck was in error in ruling that the search of the appellant's automobile did not offend the Fourth Amendment prohibition against unreasonable search and seizure.

The evidence, all seized from the automobile the appellant had been driving, consisted of a large black plastic bag containing a number of smaller packages containing heroin. There were 1550 individual wax packages, containing a total of 600.5 grams of heroin.

The stop and subsequent search of the automobile the appellant was driving began at 12:56 P.M. on October 24, 2007. The pretrial hearing, conducted by Judge Beck on August 29,

2008, denied the motion to suppress. The appellant did not testify. The hearing consisted almost exclusively of the testimony of Maryland State Police Trooper David McCarthy, who made the initial traffic stop and then presided over the ensuing investigation.

## A Traffic Stop For Speeding

■ The chronology that matters is simple. We will walk through the pertinent elements, step by step, pointing out along the way, however, how other issues interjected by the appellant are immaterial. At 12:56 P.M. Trooper McCarthy was traveling in a southbound direction on Interstate 95 in Cecil County when he observed a gray Grand Prix Pontiac with South Carolina license tags traveling faster than other traffic in the same southbound direction. He paced the Pontiac for half a mile and noted that it was traveling at a speed of 75 miles per hour in a posted 65 miles per hour zone. Accordingly, he pulled the Pontiac over to the right shoulder of the highway. It was being driven by the appellant. There were no other passengers in the car. Trooper McCarthy approached the Pontiac for the purpose of issuing the appellant a traffic citation for speeding. As a unanimous Supreme Court pointed out in *Arizona v. Johnson*, 555 U.S. ——, 129 S.Ct. 781, 172 L.Ed.2d 694, 700 (2009):

> [I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.

That stop of the Pontiac was the first material event in our analysis. Judge Beck ruled that it was a lawful traffic stop.

> The stop was based on speed, and nothing else. Whether it was 10 miles over the speed limit, 20 miles over the speed limit, or 2 miles over the speed limit, *the stop was a lawful stop.*

(Emphasis supplied). We hold that Judge Beck was absolutely on target with that ruling. The appellant, indeed, makes no challenge. The stop was good and Step One is solid.

## The First Immateriality: There Is Nothing Wrong With Investigative Opportunism

The first of the inmaterialities advanced by the appellant consists of casting aspersions on the bona fides of Trooper McCarthy in making the traffic stop. He contends that Trooper McCarthy, by summoning immediate backup and by calling for a drug-sniffing canine, betrayed his true purpose of being on the trail of a narcotics violation and that he merely exploited the traffic infraction as a subterfuge. He dismissively belittles the traffic stop as "nothing but a ploy." It is fair comment, but it is also of no avail. Even should the appellant's suspicion be true, it would not make the slightest difference. As this Court observed in *Charity v. State*, 132 Md.App. 598, 601, 753 A.2d 556 (2000):

> In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court extended law enforcement officers *a sweeping prerogative,* permitting them *to exploit the investigative opportunities* presented to them *by observing traffic infractions even when their* primary subjective *intention is to look for narcotics.*

(Emphasis supplied).

Even if a ploy, it is a ploy that the Fourth Amendment forthrightly condones. In assessing a so-called *"Whren-*stop," the only pertinent concern is that of whether the officer had facts before him that would, objectively, justify the traffic stop. That the officer, subjectively, may have had some other or some additional purpose in mind is beside the point. The *Charity* case itself is a classic illustration of the broad latitude extended to the police by *Whren.*

> *The initial stop of the appellant's automobile for a traffic infraction was completely legitimate* .... The hearing judge found as a fact that the appellant was "following too closely" and that *the stop for the traffic infraction was fully justified.* We accept that as historic fact.

> *To be sure, Sergeant Lewis was not a highway patrolman with any apparent interest in enforcing the traffic regulations per se. He was* a 15–year veteran of the Maryland

State Police *assigned to the special task of drug interdiction.* He had made between 400 and 600 arrests on the Eastern Shore of Maryland in cases "involving controlled dangerous substances being transported into or through the State of Maryland." He recounted at length his extensive training in drug interdiction at special schools and courses in Florida, Canada, Illinois, Nevada, Detroit, New Jersey, West Virginia, Virginia and North Carolina. *There is every reason to believe that* when he saw the appellant's car traveling as one of what appeared to be three cars "in convoy" southbound on a major drug corridor from New York to Norfolk and points south, *he suspected the appellant to be a drug courier. The fortuitous traffic infraction simply gave him the opportunity to pursue his primary investigative mission.*

All of that is beside the point, however, because *Whren v. United States permits a narcotics officer to seize the opportunity presented by a traffic infraction to make a stop that would not otherwise be permitted.* The narcotics officer need not apologize for this. *The "Whren stop" is part of the arsenal.*

132 Md.App. at 609–10, 753 A.2d 556 (emphasis supplied). Opportunism, far from being a constitutional sin, is an investigative virtue.

### The Proper Conceptualization of a Dog Sniff

■ Taking off, then, from the launching pad of a constitutionally unassailable traffic stop, what is the next pertinent plateau? While the traffic stop was still in progress (we will deal with the time factor in a moment), a trained drug-sniffing dog made a positive alert on the vehicle, thereby signaling the likely presence of narcotic drugs somewhere inside the vehicle. Once such a positive alert takes place, there is, *ipso facto,* probable cause for a *Carroll*–Doctrine [1] search of the automo-

---

**1.** *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

bile. Such a search was made in this case and the drugs were duly recovered. Judge Beck ruled:

> At that point in time, the traffic stop was continuing. K–9 dog already on the scene with its handler. *Leco,* with Corporal Armiger, *alerted on the car* for the basis to search the car, *the car was searched and* the *heroin was* subsequently *found.*

(Emphasis supplied).

█ We affirm that ruling. The sniffing by the dog of the exterior of the appellant's vehicle was not itself a search within the contemplation of the Fourth Amendment and required, therefore, no justification of any sort. The Supreme Court made this point emphatically in *Illinois v. Caballes,* 543 U.S. 405, 410, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005):

> *A dog sniff* conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess *does not violate the Fourth Amendment.*

(Emphasis supplied).

In *Wilkes v. State,* 364 Md. 554, 581, 774 A.2d 420 (2001), the Court of Appeals was equally clear that a dog sniff is "neither a search nor a seizure" and that the Fourth Amendment, therefore, does not apply and requires no comment.

> *Because a K–9 scan,* under the circumstances such as those present here, *is neither a search nor a seizure, Fourth Amendment issues,* in respect to such a K–9 scan, *do not arise.* Thus, Trooper Prince did not need reasonable articulable suspicion of drug-related criminal activity prior to subjecting petitioner's Escort to the K–9 scan.

*Id.* (emphasis supplied).

This Court had earlier announced the same principle in *Gadson v. State,* 102 Md.App. at 557, 650 A.2d 1354.

> *Whether the Fourth Amendment was even involved,* so as to require satisfaction, at that particular stage of the total investigative episode *depends upon whether a sniff or smell*

*by a drug detection dog constitutes a "search" within the contemplation of the Fourth Amendment. It does not.* (Emphasis supplied). See also *Cruz v. State,* 168 Md.App. 149, 161, 895 A.2d 1076 (2006) ("[A] drug dog's sniff of the exterior of an automobile that had been lawfully stopped for speeding did not implicate legitimate privacy interests.' "); *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001) ("The smelling or sniffing of the exterior surface of an otherwise protected repository (automobile, suitcase, locker, etc.) is not a 'search' within the contemplation of the Fourth Amendment.").

In stating that the dog sniff was beyond constitutional challenge, we deliberately have refrained from using the term of art "reasonable." That verbal restraint on our part is because "reasonableness" is a Fourth Amendment criterion and Fourth Amendment criteria are of no significance in appraising the use of a drug-smelling dog. The unchallengeability of a dog sniff has nothing to do with Fourth Amendment reasonableness. Our tolerance of the dog sniff is, rather, an instance of Fourth Amendment inapplicability and not one of Fourth Amendment satisfaction. A dog sniff can be neither "reasonable" nor "unreasonable" in a Fourth Amendment sense, because the Fourth Amendment can be neither satisfied nor violated where it does not apply. So long as the police agent, human or canine, is in a place where that agent has a constitutionally unassailable right to be, it is free to employ its olfactory senses in any way it wishes. The dog is as free to smell cocaine or marijuana as the officer is free to smell the roses or the garbage or "the breath of new mown hay." Neither dog nor man needs a judicial permission slip to sniff the air.

### The "Alert" Established Probable Cause

The substantive capacity of a canine "alert" to establish probable cause is also beyond challenge. Judge Cathell placed the imprimatur of the Court of Appeals on the probable-cause-generating potency of a canine "alert" on an automobile in *Wilkes v. State,* 364 Md. at 586, 774 A.2d 420:

The troopers were able to conduct a lawful search of petitioner's vehicle because *after the K–9 scan alerted to the presence of narcotics they had probable cause to do so.* We have noted that *once a drug dog has alerted a trooper "to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]."*

(Emphasis supplied).

*Gadson v. State,* 341 Md. 1, 8, 668 A.2d 22 (1995), had foreshadowed the *Wilkes* holding by six years.

Nor does Gadson dispute that *once Sandy the dog alerted* Trooper Prince to the presence of illegal drugs in the vehicle, *sufficient probable cause existed to support a warrantless search of the truck. See United States v. Dovali-Avila,* 895 F.2d 206, 207 (5th Cir.1990) *(a "dog alert" is sufficient to create probable cause to conduct a warrantless vehicle search).*

(Emphasis supplied).

In *Fitzgerald v. State,* 153 Md.App. 601, 619, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), our holding was similarly unequivocal.

As we affirm the adequacy of the warrant application, we hold that *Alex's "alert" to Apartment A was ipso facto enough to establish probable cause. Both the Court of Appeals and this Court have regularly affirmed the dispositive sufficiency of a canine "alert."*

(Emphasis supplied).

*Carter v. State,* 143 Md.App. 670, 674, 795 A.2d 790 (2002), was equally emphatic.

A trained dog scanned a vehicle and "alerted" to the presence of drugs.

From that point on, there is no question about the Fourth Amendment proprieties. *The dog "alert" supplied the probable cause for a warrantless search of the van.*

(Emphasis supplied). We spoke to the same effect in *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001):

> *When a qualified dog signals to its handler* that narcotics
> are in a vehicle, ... *that is ipso facto probable cause to*
> *justify a warrantless Carroll Doctrine search of the vehicle.*

(Emphasis supplied). See also *State v. Wallace,* 372 Md. 137,
146, 812 A.2d 291 (2002) ("[T]he law is settled that when a
properly trained canine alerts to a vehicle indicating the
likelihood of contraband, sufficient probable cause exists to
conduct a warrantless *'Carroll'* search of the vehicle."); *Stokel-*
*ing v. State,* 189 Md.App. 653, 985 A.2d 175 (2009) ("It is well
established that an alert to a vehicle by a qualified drug-
sniffing dog furnishes probable cause to perform a warrantless
search of the vehicle.").

On this issue we are simply reiterating what is now horn-
book law. Once Leco "alerted" on the Pontiac, the ballgame
was over. The Pontiac was fair game. The only thing that
remains in issue is the eight minute gap between the initial
traffic stop and Leco's "alert." It was necessary, of course, for
the Pontiac still to have been there on the shoulder of the road
legitimately when Leco arrived.

### The Second Set of Irrelevancies: The Fate
### of the Appellant Was Not Part of the
### Causation Chain

■ The appellant interrupts the analysis at this point with
two immaterial and essentially indistinguishable sub-conten-
tions. He argues first that by being removed from his auto-
mobile, he was "illegally seized." He asserts:

> Clearly, the troopers did not have probable cause to seize
> Appellant. This *seizure certainly exceeded the parameters*
> *of the traffic stop. Therefore, Appellant was illegally*
> *seized.* Thus, *Appellant's right pursuant to the Fourth*
> *Amendment has been violated.* As such, *the evidence ille-*
> *gally obtained must be suppressed.*

(Emphasis supplied). The appellant then makes the essential-
ly indistinguishable sub-contention that he was unreasonably
subjected to a *de facto* arrest without probable cause.

Notwithstanding the fact that Appellant was not placed in handcuffs, it has no bearing on the determination of whether he was arrested. *Grier, Morton* and *Dixon* support this proposition. *The troopers intended to arrest Appellant because of their suspicion. Appellant was under their real authority. Appellant was seized.* And, *Appellant was de facto under arrest.* All of the troopers' actions were conducted prior to Appellant's credentials being called in and the dog scan being conducted. Thus, *Appellant was arrested without probable cause. Accordingly, the lower court erred in denying Appellant's motion to suppress.*

(Emphasis supplied).

■ It is not necessary to recite the tetralogy of *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Brendlin v. California,* 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); and *Arizona v. Johnson,* 555 U.S. ——, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), for the proposition that in a traffic stop case the police may order the driver out of the car, because the propriety of that police action is utterly immaterial. As long as the automobile itself was being constitutionally detained as of the moment the dog made its positive alert, whatever may have been happening to the appellant in the meantime, good or bad, is utterly immaterial.

Whether the appellant was being royally wined and dined, on the one hand, or was being greeted as if exiting the Biograph Theatre in Chicago, on the other, is an extraneous consideration that had no impact on the legitimacy of the dog sniff. For other purposes, of course, it may have made a great deal of difference. We are not suggesting otherwise. We are simply stressing the point, perhaps starkly so, that the treatment of the appellant as a person, whether exemplary or deplorable, was not a factor in the suppression syllogism. The appellant was being lawfully detained. The degree of restraint, minimal or maximal, did not influence, therefore, the fact that the car was properly still in place when the dog

arrived. All that matters is that the appellant was not free to drive the car away. Any restraint on him beyond that point, even if excessive, did not affect the immobility of the car.

■ Every Fourth Amendment violation, assuming one to have occurred, does not, in and of itself, require the suppression of evidence. To justify the exclusion of evidence, it is further required that the discovery of the evidence shall have been the proximate result of the Fourth Amendment violation. There was in this case no even arguable cause-and-effect relationship between the recovery of the evidence and the alleged Fourth Amendment grievances being urged by the appellant. Even if, *arguendo,* the appellant had been "illegally seized" and even if, *arguendo,* the appellant had been "subjected to a *de facto* arrest without probable cause," that might give rise to a § 1983 constitutional tort action, but it would not adversely affect the legitimacy of the dog sniff and the consequential *Carroll* Doctrine search of the Pontiac in this case. Suppression requires a showing of proximate causation. In *Charity v. State,* 132 Md.App. at 632, 753 A.2d 556, we stressed the necessity of keeping one's eye on the critical issue and not being distracted by immaterialities.

So an unconstitutional detention of the appellant occurred. So what? Why do we care? What significance, if any, does that unconstitutional detention have for the only issue before us in this case. *It is so easy at times for all hands to get excited about the rightness or wrongness of police behavior that everyone loses sight of the ultimate issue.*

There is a single contention raised by the appellant on this appeal. As he himself phrases it, **"THE SEARCH OF THE APPELLANT'S VEHICLE WAS VIOLATIVE OF THE FOURTH AND FOURTEENTH AMENDMENTS."** (Emphasis supplied).

An analysis of materiality at times calls for an almost surgical separation of concerns. Selecting what to ignore, however, is not cavalier; it is an indispensable diagnostic skill, for some investigative events have juridical significance while

others do not. Whereas a search incident or a frisk (or even, perhaps, a confession or an on-site identification) may depend for its admissibility on the constitutional propriety of what the police have been doing to the detainee, a *Carroll* Doctrine search of an automobile, by contrast, may in the meantime have diverged onto a self-contained doctrinal path of its own. This is such a case. So long as the search of the Pontiac itself did not violate the Fourth Amendment, it simply does not matter, on this particular issue, whether the seizure and/or arrest of the appellant did so or not.

## The Shelf Life of a Traffic Stop

The third and final critical issue in this case is whether the appellant's vehicle, which had been legitimately stopped initially, was still being legitimately detained as of the moment the dog sniff occurred. The vehicle was stopped at 12:56 P.M. Corporal Chris Armiger, with the K–9 Leco in tow, arrived at the scene at 1:00 P.M., four minutes later. The terminal time for Fourth Amendment appraisal, however, is not when the K–9 unit arrived on the scene, but the time when the actual K–9 "alert" was made. Leco made a positive alert for controlled dangerous substances at 1:04 P.M., eight minutes after the initial stop. At that point, as we measure the length of the detention that must be subjected to Fourth Amendment reasonableness analysis, the clock stopped running. Under the subhead "The Clock Stops," this Court discussed the terminal significance of the K–9 "alert" in *State v. Ofori*, 170 Md.App. 211, 221, 906 A.2d 1089 (2006).

> At the other end of the time continuum, *once the K–9 "alerted"* to the probable presence of contraband drugs in the Cadillac, *all Fourth Amendment uncertainty came to an end.* Officer Shaffer and Officer Brooks had, by virtue of the K–9 "alert," unquestionable probable cause for a warrantless *Carroll*–Doctrine search of the Cadillac, which they then proceeded to execute.

(Emphasis supplied).

We are dealing in this case with a detention time of eight minutes. Even by the fast-moving stopwatch of a traffic stop,

eight minutes does not come close to the outer permissible limits. Trooper McCarthy had phoned in to police headquarters the appellant's driver's license data and the car rental agreement for the Pontiac. He had not yet received any reply when the dog sniff took place. Trooper McCarthy testified that at the time the K–9 alert was made, the traffic stop was still in progress. He had not yet heard from his dispatcher about warrant checks on the appellant or a stolen car report on the automobile.

TPR. MCCARTHY: I still have not received responses back through MVA or any warrant checks, at this point.

. . . .

TPR. MCCARTHY: The traffic stop is still going on. We are going to do a K–9 scan during the course of the traffic stop.

On redirect examination, Trooper McCarthy reaffirmed that the traffic stop was still very much in progress when the K–9 alert took place.

[I]sn't it true, at that point in time, you still had not completed either the traffic citation or traffic warning that you were going to be giving Mr. Jackson for the speeding violation?

TPR. MCCARTHY: That's correct. *I wasn't finished with the traffic stop, no, sir.*

(Emphasis supplied). See *Byndloss v. State,* 391 Md. 462, 893 A.2d 1119 (2006), for an extensive survey of the length of detention permitted in the case of a traffic stop. In almost all of the cases, the critical breaking point between permissible and unreasonably prolonged traffic detentions occurs at somewhere near the 20 to 25 minute marker.

As we took pains to point out in *Charity v. State,* 132 Md.App. at 617, 753 A.2d 556, however, the reasonableness of any particular traffic stop detention must be assessed on a case-by-case basis and not by doing a "swatch comparison" with other traffic stop cases.

Even a very lengthy detention may be completely reasonable under certain circumstances. Conversely, even a very

brief detention may be unreasonable under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop. *We must assess the reasonableness of each detention on a case-by-case basis and not by the running of the clock.*

*... Reasonableness may depend on whether the purpose of the traffic stop is actually being pursued with some modicum of diligence.* We repeat that in *processing a traffic infraction the police are not to be monitored with a stop-watch.*

(Emphasis supplied).

*Charity* also made it clear that the courts are not holding a time gun on the traffic stop and are not absolutely prohibiting alert attentiveness to a possibly simultaneous secondary investigation.

*We are not suggesting* for a moment *that* when the police effectuate a traffic stop, *they are operating under a "time gun" or may not pursue two purposes essentially simultaneously, with each pursuit necessarily slowing down the other to some modest extent.*

132 Md.App. at 614, 753 A.2d 556 (emphasis supplied).

A fleeting eight minutes does not come close to the limit and does not itself call for more finely calibrated analysis. The continuing legitimacy of the traffic-based detention, moreover, had, long before reaching that eight-minute marker, already become redundant. This was not a case where the legitimate detention attendant on the traffic stop had come to an end before a fresh detention based on a *Terry*-stop for drugs had begun. See *Ferris v. State,* 355 Md. 356, 372, 735 A.2d 491 (1999) ("Once the purpose of that [traffic] stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention."); *Whitehead v. State,* 116 Md.App. 497, 506, 698 A.2d 1115 (1997); *Snow v. State,* 84 Md.App. 243, 264–65, 578 A.2d 816 (1990) ("That purpose [to issue a ticket for speeding] was fully fulfilled, but the detention was continued."). In this case, there was no break between two distinct detentions but only a single unbroken

detention that for a time enjoyed dual and overlapping purposes.

### The Early Ripening of a Second Rationale

Even if, purely *arguendo,* we were to assume that the length of the detention for processing the speeding violation had been excessive as of the time of the K–9 alert, such a conclusion would still not be fatal to the State's cause. The initial detention was, to be sure, exclusively for a traffic infraction. Almost immediately, however, the status of that detention took on a dual character as it was ratchetted upward by events into a *Terry*-stop for a narcotics violation in addition to a traffic stop.

Indeed, justification for a *Terry* stop for drugs did not trail behind the traffic stop by more than the blink of an eye. We will discuss the accumulation of suspicious factors in a moment, but two of them—the observation of the out-of-state tags and the vehicle's presence on the I–95 "corridor"—actually preceded the traffic stop. Three other factors—the observation of 1) the air fresheners, 2) the appellant's extreme nervousness, and 3) the cell phones—occurred simultaneously with Trooper McCarthy's first approach of the appellant as he sat behind the steering wheel. Yet another factor—the production of the North Carolina rental agreement in the name of a female—followed within the minute. As the sole predicate for the detention, the traffic stop lost that exclusive status within a fraction of a minute. From that moment forward, we will be measuring the permissible length of detention not solely of a traffic stop but also of a *Terry* stop for drugs.

The appellant, however, wants to stay within the box of a traffic stop. In yet another detour into immateriality, he contends that once a detention begins as a traffic stop, it is somehow constitutionally unfair to allow it to transmute into a *Terry* investigation of suspected crime. The identity of the police rationale, he maintains, once fixed, should not evolve into something else. He offers, however, neither law nor logic in support of such doctrinal immutability. Our response to the appellant is that the justifying rationale for a detention

need not be one or the other; it may happily be both. The appellant's argument, moreover, would, in effect, overrule *Whren v. United States,* which placed the Supreme Court's imprimatur on the existence of a dual purpose. Even a brief encounter on the shoulder of a road may be dynamic and need not remain doctrinally static.

There is no logically sound reason why at any point in the course of a traffic stop, articulable suspicion might not achieve critical mass for a *Terry* criminal investigation. If such articulable suspicion may develop in the total absence of a traffic stop, it may as readily develop in the course of one. From that point on, the processing of 1) the traffic infraction and 2) the *Terry* investigation for narcotics involvement may proceed simultaneously on parallel tracks. The time limit for processing the traffic infraction, to be sure, might run its course before the *Terry* drug investigation time limit runs out; but the detention itself will still be reasonable as long as either of its justifying rationales, the old one or the new one, remains vital. This type of escalation from a traffic stop alone into a *Terry* drug stop was the phenomenon of which we spoke in *State v. Ofori,* 170 Md.App. at 245, 906 A.2d 1089.

The caselaw universally recognizes the possibility that by the time a legitimate detention for a traffic stop has come to an end, or more frequently *while the legitimate traffic stop is still in progress, justification may develop for a second and independent detention. Unfolding events in the course of the traffic stop may give rise to Terry-level articulable suspicion of criminality,* thereby warranting further investigation in its own right and for a different purpose.

(Emphasis supplied). See also *Wilkes v. State,* 364 Md. at 574, 774 A.2d 420; *Ferris v. State,* 355 Md. 356, 372, 735 A.2d 491 (1999); *Munafo v. State,* 105 Md.App. 662, 670, 660 A.2d 1068 (1995). Whether to denominate the beefed-up phenomenon as two detentions or as a single detention with two justifications may best be left for philosophy class.

### The Shelf Life of a *Terry* Drug Stop

Once a detention is predicated on a *Terry*-stop for narcotics, a new time limit comes into play completely differ-

ent from that which applies to traffic stops. *State v. Ofori,* 170 Md.App. at 250, 906 A.2d 1089, spoke of this shift.

> *Once the analysis shifts from* an examination of *the reasonable duration of a traffic stop* to the very distinct examination of *the reasonable duration of a Terry-stop for suspected drug activity,* a *different standard for measuring the reasonableness of the length of detention is brought to bear on the problem.* The entire argument of the appellee in this case is based on the false assumption that we are only measuring the reasonable duration of a traffic stop. We are not.

(Emphasis supplied).

Whereas initially the focus may have been on the diligent processing of a traffic infraction, the investigative upgrade to a *Terry*-stop for drugs prescribes a far more patient and leisurely wait for the arrival of K–9 assistance. In *Carter v. State,* 143 Md.App. 670, 692–93, 795 A.2d 790 (2002), we explained the difference in approaches:

> *Once* a reasonable time for *the processing of a traffic charge has expired, even a minimal further delay to accommodate the arrival of a drug-sniffing canine is not permitted.* That foreclosure is for the obvious reason that *the dog sniff,* however valuable it might be for other investigative purposes, *does not in any way serve the purpose of the justifying traffic stop.* Once the purpose of the traffic stop has been fully and reasonably served, no further detention is permitted. . . .
>
> When, by contrast, the energizing articulable suspicion is that a violation of the drug laws may be afoot, *the time constrictions on the Terry*-stop are very different. The bringing of a drug-sniffing canine to the scene is *in the direct service of that investigative purpose and the measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the scene. This use of a trained dog,* as will be discussed, is an investigative practice that *is looked upon with favor.*

(Emphasis supplied).

In measuring the permissible length of detention for a *Terry*-stop for a drug investigation, the Court is no longer

concerned only with the expeditious processing of a traffic infraction. Under the drug related *Terry*-stop rationale, the justification for a longer period of detention is the need to wait a reasonable amount of time for the arrival of the drug-sniffing dog at the scene. *State v. Ofori,* 170 Md.App. at 251, 906 A.2d 1089, spoke of the antipodal difference between the two waiting periods.

> Nothing so well symbolizes the difference between a traffic stop and a *Terry*-stop for drugs as their respective attitudes toward the presence of drug-sniffing dogs. *The dog has no role to play in a traffic stop. The dog may be the star performer in a Terry-stop for drugs.* The traffic stop, once completed, will not await the arrival of the dog for so much as 30 seconds. *The Terry-stop for drugs very deliberately and patiently does await the arrival of the dog. The dog's arrival is,* indeed, *the primary reason for waiting.*

(Emphasis supplied).

Once articulable suspicion has developed that the appellant is a drug courier, the most efficacious way to confirm or dispel such suspicion is to have a K–9 unit brought to the scene to resolve the problem. As *Ofori* pointed out, 170 Md.App. at 252, 906 A.2d 1089:

> In a traffic stop, the dog is no more than a gratuitous interloper, whom the police may be lucky enough to sneak in through a side door before the traffic-related performance is over. *In a Terry-stop for drugs, dog sniffing is, by contrast, a highly favored investigative modality. The prime purpose of a Terry-stop is to confirm or dispel the initial suspicion.* In *State v. Gant,* 637 So.2d 396, 397 (La.1994), the Supreme Court of Louisiana praised *the use of a drug-sniffing dog as a technique whereby the police "pursued a means of investigation likely to confirm or dispel their suspicions quickly."*

(Emphasis supplied).

The difference between the two time limits can be diametric. In *Carter v. State,* 143 Md.App. 670, 696–97, 795 A.2d 790

(2002), this Court held that a 35–minute delay between an initial stop and a K–9 alert, which we surmised might well have been an excessive delay in a traffic stop case, was eminently reasonable in a case involving a drug-related *Terry* stop. In *State v. Ofori*, 170 Md.App. at 243, 906 A.2d 1089, we opined that a 24–minute delay between an initial stop and a K–9 alert would have been excessive had the State been depending on a traffic stop rationale alone.

If, *arguendo*, the detention necessary for the processing of the traffic violation were the only Fourth Amendment basis on which the K–9 "alert" in this case could rest, we would affirm the decision of the hearing judge that the length of the detention was unreasonable.

In *Ofori*, however, the initial traffic stop had escalated into a *Terry*-stop for drugs. Measured against a very different standard, that same 24–minute delay was deemed eminently reasonable, 170 Md.App. at 254, 906 A.2d 1089.

*For a Terry-stop for a drug investigation*, where the core purpose of confirming or dispelling suspicion could be eminently served by the use of a K–9 unit, *nobody has ever found a delay of 16 or 17 (or 24 minute) to be an unreasonable violation of the Fourth Amendment.*

(Emphasis supplied)

For cases involving *Terry*-stops for drugs, see *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir.1988) (a 50 minute delay was not unreasonable); *United States v. French*, 974 F.2d 687, 690–93 (6th Cir.1992) (*a 45 minute delay* while a drug dog was brought to a truck stopped on a highway); *United States v. Glover*, 957 F.2d 1004, 1012–13 (2d Cir.1992) (a *30 minute detention was reasonable* because a "narcotics dog was on the way"); *Cresswell v. State*, 564 So.2d 480, 481 (Fla.1990) (*a 45 minute detention was reasonable* because it was "the time necessary to obtain a narcotics dog"); *State v. Gant*, 637 So.2d 396, 397 (La.1994) (*a 30 minute detention was reasonable* while a drug dog was brought to the scene). And see *United States v. Hooper*, 935 F.2d 484, 498 (2d Cir.1991) (*30 minute detention* pending arrival of narcotics dog); *Unit-*

*ed States v. Knox,* 839 F.2d 285, 290–91 (6th Cir.1988) *(30 minute detention* pending arrival of narcotics dog); *United States v. Sullivan,* 903 F.2d 1093, 1097–98 (7th Cir.1990) *(45 minute detention* pending arrival of narcotics dog); *United States v. Sterling,* 909 F.2d 1078, 1081, 1085 (7th Cir.1990) *(75 minute delay* pending arrival of narcotics dog); *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991) *(30 minute detention* pending arrival of narcotics dog); *United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) *(20 to 30 minute detention* pending arrival of narcotics dog); *United States v. Borrero,* 770 F.Supp. 1178, 1189–91 (E.D.Mich.1991) *(70 minute detention* pending arrival of narcotics dog) (Emphasis supplied).

### The Step–By–Step Accumulation of Articulable Suspicion

 The basis for the detention in this case ratchetted up to the more serious *Terry* level almost immediately. As articulable suspicion accumulates, in this case the limning of a suggestive profile of a drug courier, it may well be made up of bits and pieces no one of which, standing alone has any dispositive significance. We spoke of this in *Carter v. State,* 143 Md.App. at 687, 795 A.2d 790:

> The mosaic as a whole may depict a highly suspicious scene although none of its constituent tesserae, viewed in isolation, suggests anything untoward.

### A. Nervousness

Trooper McCarthy testified that, as he approached the appellant and asked for his driver's license and automobile registration, the appellant seemed to be more than ordinarily nervous.

> I identified myself to him. I told him that the traffic stop was being recorded with a camera that was in my patrol vehicle, and I asked him for his license and his registration. It was at that time he asked me to repeat myself several times about the traffic stop being recorded. And, I noticed that as he was speaking to me … *He was very talkative and he was also very soft spoken. So I had a hard time*

*hearing him also.* But I did notice that *his heart was racing. I could see his shirt just pounding back and forth.* He did give me a driver's license and a rental contract for the vehicle.

(Emphasis supplied). In this regard, see *Stokeling v. State,* 189 Md.App. 653, 985 A.2d 175 (2009) ("[W]hen the appellant was inside the stopped Chrysler, Officer Webster noticed that he was 'shaking' and was experiencing 'rapid breathing' and that he and the driver both were 'very nervous.' The appellant continued to shake and act nervously after exiting the vehicle and, when asked why by Officer Fanning, gave an answer that made no sense. (He replied that 'it was cold out' even though it was a hot summer night.)").

A nervous reaction by a detainee, we readily agree, means almost nothing by itself, but like the slow drip, drip, drip of water on a rock, it may nonetheless contribute to a larger totality. A single drop means little, but in the end a mountain has become a plain.

## B. Air Fresheners

Another piece of the mosaic was the presence in the car of air fresheners.

Some of the things I noticed, also, *while I was up at the passenger window. I noticed some new air fresheners in the console area.*

(Emphasis supplied).

On redirect examination, Trooper McCarthy elaborated on the possible significance of air fresheners.

THE STATE: You were asked about these air fresheners. What, if any, significance have several air fresheners in a car?

TPR. MCCARTHY: I would say [that *in] a high percentage of my seizures that I've made, air fresheners were involved.* In this case, being a rental car meant a little bit more because *this person* ... This is what [is] my opinion was, *bought these air fresheners for this trip and people use*

*the air fresheners to either mask the odor or try to throw off
a dog scent for narcotics.*

(Emphasis supplied).

There is nothing criminal, of course, about air fresheners,
but, contrary to the appellant's anguished protest, we are not
looking for criminality *per se*. We are looking only for the
tell-tale characteristics of a drug courier. There are many
things for which one may not go to jail that are nonetheless
things for which one may be legitimately stopped and ques-
tioned. A clue need only be a clue. Just as some persons
have a sweet tooth and others, an addiction to nicotine, drug
couriers seem to enjoy an incorrigible affinity for air freshen-
ers. Such olfactory delicacy, moreover, almost always helps to
give them away.[2] A picture begins to emerge, even if not yet
a mug shot.

### C. Cell Phones

Trooper McCarthy then noticed two cell phones sitting in
the area of the console. The cell phone, of course, has become
a commonplace. But why two? Trooper McCarthy explained:

THE STATE: *What significance, if any, is having mul-
tiple cell phones with a vehicle? Based on, again, your
experience with I–95 patrolling and drug trafficking and
things of that nature.*

TPR MCCARTHY: *With my experience and with speak-
ing to drug trafficker's in the past, they usually have a cell
phone, a personal cell phone and a cell phone [with] which
they talk to their source and people they deal with in the
drug world.*

(Emphasis supplied).

On cross-examination, the colloquy about cell phones went
on.

MR. DAWSON: *How do you know that they use their
cell phones for business in the drug world?*

---

2. If there is an accountant for the narcotics industry, it would be
interesting to see the cost/benefit analysis on air fresheners.

TPR. MCCARTHY: *Because I've interviewed and have sat in interviews where they've said so.*

MR. DAWSON: You've been in interviews where they said that they use the phone for drug transactions?

TPR. MCCARTHY: I've been in several interviews where they have told me that *one cell phone is to talk to one person and one person only, and that's their source.*

MR. DAWSON: Okay. So, as a result of that, everybody that you come across with two cell phones is either involved in something illegal or something, if it's a rental car?

TPR. MCCARTHY: Not *by itself,* no, sir, *it doesn't mean much, but when you put a totality of those indicators together, it does mean a lot, especially being on Interstate 95.*

(Emphasis supplied).

In appellate argument, the appellant would like to talk about the cell phones in a vacuum. They were not, however, in a vacuum. At this point, the issue has become a multi-factored one concerning nervousness plus air fresheners plus cell phones.

## D. The I–95 Corridor

The accumulation of tell-tale characteristics, moreover, goes on. Location is also not without significance. The appellant was not stopped at Deep Creek Lake or in the Patapsco State Park. He was stopped southbound on Interstate 95. Interstate 95 is recognized as a major corridor for drug trafficking between New York City and Baltimore, Washington, and points south. Trooper McCarthy characterized the corridor:

TPR. MCCARTHY: In my experience, I've worked Interstate 95 for 4 1/2 years. *Interstate 95 is historically, and still is today, a major corridor for transportation of drugs,* guns, untaxed cigarettes, counterfeit clothes, cd's, and those together, in my experience, meant that criminal activity could be present, yes, sir.

(Emphasis supplied).

A profile has its unquestioned values as well as its limitations. The fact that everyone on Interstate 95 is not a drug

courier does not imply that it is not characteristic of a drug courier to be on Interstate 95.

### E. Rental Cars and Out–of–State Tags

Yet another tell-tale characteristic of a drug courier is the frequent use of a rental car, particularly one with out-of-state license tags. The Pontiac in this case carried South Carolina tags. The appellant produced a rental agreement that showed that the car had been rented in North Carolina by a female, whom the appellant claimed to be his aunt. On cross-examination, Trooper McCarthy pointed out that, in two respects, this is a familiar part of the drug courier profile.

MR. DAWSON: In fact, in this case, the rental agreement even included him as an additional driver, correct?

TPR. MCCARTHY: It did.

MR. DAWSON: So, there wasn't anything wrong with that, correct?

TPR. MCCARTHY: *What sparked my interest, in my experience, rental agreements, are a lot of times rented by females,* which in this case was.

MR. DAWSON: Okay.

TPR. MCCARTHY: Who was not there on the stop, so . . .

MR. DAWSON: So, *is this a practice for the Maryland State Police . . . that whenever they encounter an automobile that is rented by a female, driven by a male, that that's an indication of maybe drug trafficking?*

TPR. MCCARTHY: *It is one of the indications, yes, sir.*

(Emphasis supplied).

Nervousness plus air fresheners plus cell phones plus the I–95 corridor plus a rental car with out-of-state tags? In a test for what only, after all, has to be a reasonable suspicion, there are just too many suggestive characteristics coming together to be blithely ignored.

## F. An Incredible Journey

What this Court, however, finds irremediably suspicious, as we make our independent *de novo* determination, is the appellant's fumbling explanation of where he had been. The appellant told Trooper Conner that he was coming "from Hagerstown" and had "stopped at the Baltimore Travel Plaza." Trooper McCarthy recounted the appellant's explanation of his itinerary to Trooper Conner.

> TPR. MCCARTHY: Trooper Conner told me that *Mr. Jackson had told him that he was coming from Hagerstown, Maryland and had stopped at the Baltimore Travel Plaza, which,* almost immediately to me *did not make sense considering he was North of where he said he was traveling from and traveling Southbound* on 95 didn't make sense to me. Trooper Conner also voiced his concern that he thought that Mr. Jackson was showing signs of either fight or flight tendencies.

(Emphasis supplied).

On cross-examination, Trooper McCarthy testified as to his reaction:

> MR. DAWSON: I believe you informed the Court that he was traveling from Hagerstown, correct?
>
> TPR. MCCARTHY: That's correct.
>
> MR. DAWSON: And that you found that to be suspicious because Hagerstown was in the wrong direction, correct? He was past Hagerstown.
>
> TPR. MCCARTHY: *He wasn't anywhere close. He would have never been on that road to be in Hagerstown.*

(Emphasis supplied).

The appellant's explanation of whence he came staggered belief.[3] When stopped, the appellant was in the northeast

---

3. Perhaps what Trooper Conner reported to Trooper McCarthy is not what the appellant meant to say, but how are we to know this? The appellant was in the courtroom and heard Trooper McCarthy's testimony. He could have testified, of course, at a pretrial suppression hearing and cleared up any misunderstanding without any fear that his words

corner of Maryland, just south of the Delaware line and still east of the Susquehanna River. The Baltimore Travel Plaza was still miles to his south, in the direction in which he was going and not in the direction from which he was coming. There was no rational possibility of his having earlier stopped there, unless he was traveling backwards. There was, moreover, no way, short of a flanking maneuver through Harrisburg and Philadelphia worthy of Stonewall Jackson, that a traveler could be coming "from Hagerstown" when stopped on southbound I–95 in Cecil County. That the appellant was self-evidently caught in, to put it gently, an awkward quandary was another factor, and a big one, in the totality that added up to reasonable articulable suspicion. *Terry* could not ask for more.

### If It Looks Like a Duck and Walks Like a Duck and Quacks Like a Duck . . .

The Supreme Court in *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), stressed the importance of the totality approach.

> *Terry* itself involved *"a series of acts, each of them perhaps innocent"* if viewed separately, but which taken together warranted further investigation. We noted in *Gates* that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n

---

could later be used against him on the merits of guilt or innocence. There was thus no risk of self-incrimination. He enjoyed use immunity. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The appellant could have readily explained what he meant to say without risking any jeopardy to his constitutional privilege against self-incrimination. He chose, however, not to do so.

We are, of course, constitutionally precluded from taking a defendant's trial silence into consideration. In a very different forum in which he could not incriminate himself, by contrast, we are by no means precluded. Silence, under certain circumstances, may be very relevant and may, indeed, speak volumes. We only decline to take relevant silence into consideration when we are constitutionally prohibited from doing so. We are not so prohibited in reviewing this suppression hearing. We are completely free to infer that no innocent explanation was forthcoming because there was no innocent explanation.

making a determination of probable cause *the relevant inquiry is* not whether particular conduct is 'innocent' or 'guilty,' but *the degree of suspicion that attaches to particular types of noncriminal acts."* That principle applies equally well to the reasonable suspicion inquiry.

(Emphasis supplied).

Dispositive in this regard is the unanimous decision of the Supreme Court in *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002):

When discussing how *reviewing courts* should make reasonable-suspicion determinations, we have said repeatedly that they *must look at the "totality of the circumstances"* of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. This *process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."*

(Emphasis supplied).

The Ninth Circuit in *Arvizu* had ruled that a *Terry*-stop was unconstitutional. It had examined each of seven factors in isolation and had found each amenable to an innocent explanation. The Supreme Court resoundingly rejected such fragmented analysis.

*The court's* evaluation and *rejection of seven of the listed factors in isolation* from each other *does not take into account the "totality of the circumstances,"* as our cases have understood that phrase. *The court appeared to believe that each observation* by Stoddard that *was by itself readily susceptible to an innocent explanation* was entitled to "no weight." *Terry,* however, precludes this sort of divide-and-conquer analysis. The officer in Terry observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. *Although each of the series of acts was "perhaps innocent in*

*itself," we held that, taken together, they "warranted further investigation."*

534 U.S. at 274, 122 S.Ct. 744 (emphasis supplied).

The Supreme Court explained that the totality may communicate a message that no individual fragment conveys.

> *A determination that reasonable suspicion exists,* however, *need not rule out the possibility of innocent conduct.* Undoubtedly, *each of these factors alone is susceptible to innocent explanation,* and some factors are more probative than others. *Taken together,* we believe *they sufficed to form a particularized and objective basis for* Stoddard's *stopping the vehicle,* making the stop reasonable within the meaning of the Fourth Amendment.

534 U.S. at 277–78, 122 S.Ct. 744 (emphasis supplied).

In *State v. Ofori,* 170 Md.App. at 247–48, 906 A.2d 1089, this Court also emphasized the importance of the totality approach in the assessment of *Terry* level articulable suspicion.

> There might, of course, have been an innocent explanation for any of these phenomena, standing alone. That is of no moment. *Reasonable articulable suspicion is assessed not by examining individual clues in a vacuum but by getting a "sense"* of what may be afoot *from the confluence of various circumstances. Suspicion,* particularly to a trained law enforcement officer, *may be greater than the sum of its parts.*

(Emphasis supplied).

### Bleiben Sie, Bitte, Mein Hund!

Beyond the Fourth Amendment issues, the appellant makes the additional argument that an actual K–9 alert on the Pontiac never took place. State Police Corporal Chris Armiger was Leco's handler. As Leco circled the Pontiac, she alerted by giving a "passive sit response" at the rear passenger door. Corporal Armiger explained the technique to Judge Beck:

THE COURT: Passive sit, you are saying?

CPL. ARMIGER: A passive sit response, yes. *Our dogs aren't trained,* as other departments are, *to actively alert where they are scratch and paw.*

THE COURT: Um huh.

CPL. ARMIGER: Just because of the liability that would be damaging vehicles, damaging paint. So, *our K–9's are taught to show a passive response when they come into contact with the odor of CDS.*

THE COURT: All right.

THE STATE: Now, you said, in this case, Leco did have a passive sit response near the right rear, is that what you said?

CPL. ARMIGER: Yes.

(Emphasis supplied).

Corporal Armiger also explained what he does after Leco has given a positive alert.

THE STATE: Okay. And, what did you do at that time? What *do you normally do when you have,* let's say, *a positive alert,* do you give that information to another officer or . . .

CPL. ARMIGER: *The first thing I do is, I'll reward the dog.*

THE STATE: Okay.

CPL. ARMIGER: My dog uses a ball that's tied to a string. *Throw the ball to the dog, we'll tug, play for a minute,* and usually *on the way back I'll either nod my head to the Trooper or say, "it's positive".* *First thing I do is put the dog . . . That's on the way putting the dog back in the car.* I don't let the dog stay out or anything like that. The dog's a single purpose dog for narcotics detection. So, she'll go back up in her car and then I'll return to the traffic stop and be of any assistance that I can.

THE STATE: Okay. *And that's what occurred in this particular cases?*

CPL. ARMIGER: *Yes.*

(Emphasis supplied).

On cross-examination, Corporal Armiger confirmed that the procedure in this case was routinely without incident.

MR. DAWSON: On this particular day, was Leco ... *Did he have any problems that day?*

CPL. ARMIGER: *She didn't have any problems, no.*

MR. DAWSON: She ... *Was she eratical,* she was okay, *responsive to you?*

CPL. ARMIGER: *She was fine.*

(Emphasis supplied).

Corporal Armiger walked again through the procedure.

MR. DAWSON: [T]he passive sit response ... And, just so I'm clear, is when the dog has a hit, the dog sits. That's the passive response.

CPL. ARMIGER: *When the dog detects the odor of what it's trained to detect,* one of those seven odors, *the dog will show a behavior change. And our dogs are trained to sit at the strongest source of the odor. So, the dog will sniff until it gets to what it thinks is the strongest scent* that it can get to *and then it will sit.*

MR. DAWSON: *On its own?*

CPL. ARMIGER: *Yes, there's no direction by me, it's passive.*

(Emphasis supplied).

The appellant argues that Corporal Armiger did not allow Leco to make a passive alert but actually directed her to do so. Defense counsel directed the corporal's attention to a videotaped recording, with sound, of the scanning procedure. Counsel tried to establish that Corporal Armiger ordered Leco to stop. It must first be explained that Leco speaks German.

THE COURT: What was the word you used?

CPL. ARMIGER: The word is "bleiben."

THE COURT: "Bleiben"?

CPL. ARMIGER: It means "to stay." The shortened version of it is "bleib."

THE COURT: All right.

CPL. ARMIGER: It['s] German "to stay." It's one of her commands.

(Emphasis supplied).

Although the timing was close, Corporal Armiger explained that he commanded Leco to stop ("bleib") immediately after she had made her passive alert so that he could give her her expected reward.

MR. DAWSON: Did you hear that? Did you hear yourself telling her to stop?

CPL. ARMIGER: Can you back that up and let me listen to it again? That's "bleib." That means "to stay" in German.

MR. DAWSON: At any rate, you told her ... You gave her a command, correct?

CPL. ARMIGER: *She already showed a passive sit response. I told her to stay so I could get the ball out and give it to her.*

(Emphasis supplied).

Judge Beck, who also saw and heard the tape, heard it and understood it precisely as Corporal Armiger had explained it.

THE COURT: His testimony is, *the dog alerted with a passive sit response. He said, "bleib", short for "bleiben," so that he could reward the dog for the dog's action. That's what I heard.*

(Emphasis supplied).

We hold that that finding was not clearly erroneous. Bleib!

### Conclusion

Once we have filtered out the extraneous static, we are left with a legitimate stop followed by a legitimate eight-minute detention followed by a legitimate dog sniff. That's all there is to it.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.